AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

❐ Original


CLERK'S OFFICE
A TRUE COPY
Sep 28, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

The Cellular Device Assigned Call Number 414-861-3177, as further described in Attachment A

)
)
)
)
)
)
)

Case No. **24-M-500 (SCD)**

Matter No. 2024R00197

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before     10-12-24     *(not to exceed 14 days)*
❐ in the daytime 6:00 a.m. to 10:00 p.m.     ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to     Hon. Stephen C. Dries     .
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❐ for _____ days *(not to exceed 30)*     ❐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     9-28-24. 7:25 pm

*Judge's signature*

City and state:   Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched
### Matter No. 2023R201

1.      Records and information associated with the cellular device assigned call number **414-861-3177** (referred to herein and in Attachment B as the "Target Cell Phone"), that is in the custody or control of AT&T referred to herein and in Attachment B as the "Service Provider") a wireless telephone service provider headquartered at 11760 us Hwy 1 N. Palm Beach, FL 33408.

2.      The Target Cell Phone.

Page 28

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**
**Matter No. 2023R201**

**I.      Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a. The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from September 1, 2024, to present:

    i. Names (including subscriber names, usernames, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long-distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number

("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

Case 2:24-mj-00500-SCD     Filed 09/28/24     Page 5 of 40     Document 1

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Case 2:24-mj-00500-SCD    Filed 09/28/24    Page 6 of 40    Document 1

Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

II.     This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

III.     **Information to be Seized by the Government**

73.     All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession with intent to distribute controlled substances, conspiracy to possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843, committed by Marquan C. OWENS, Makaylah BRACKINS, and other identified and unidentified subjects during the period of September 1, 2024, to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE

A TRUE COPY

Sep 28, 2024

s/ JDH

Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )

The Cellular Device Assigned Call Number )
414-861-3177, as further described in Attachment A )

Case No. **24-M-500 (SCD)**

Matter No. 2024R00197

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846 and 843(b) | Possession with Intent to Distribute a Controlled Substance; Conspiracy; Unlawful Use of a Communication Facility to Facilitate the Distribution of a Controlled Substance. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Aaron Hoppe, DEA TFO,
_____
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 9-28-24

_____
Judge's signature

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
_____
Printed name and title

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**
**Matter No. 2024R197**

I, Aaron Hoppe, a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), for information about the location of the cellular telephone assigned call number **414-861-3177,** (the "**Target Cell Phone**"), whose service provider is AT&T ("Service Provider"), a wireless telephone service provider headquartered at 11760 US Hwy 1, N. Palm Beach, FL 33408. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.     In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

3.     Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing,

Case 2:24-mj-00500-SCD     Filed 09/28/24     Page 9 of 40     Document 1

routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phone**.

4. I have been a law enforcement officer since May 30, 2007. I am currently assigned to the Waukesha County Sheriff's Department Detective Bureau. I have been assigned to a Federal Drug Task Force (Milwaukee HIDTA) and have been assigned to the Waukesha County Metro Drug Unit in 2012-2013, 2015-2017, and from 2022-Present. I have been a part of hundreds of state and federal investigations related to drug activity.

5. I have received extensive training on the investigation of death investigation, narcotics investigation, cell phone analytics, and I am currently a member of the Board of Directors for the Wisconsin Association of Homicide Investigation.

6. I have conducted investigation ranging from death, drug, property, and child exploitative crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting an investigation into many drug investigations, and drug related death investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics will mainly utilize their cell phone to set up a transaction for narcotics utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos, which are also used by drug traffickers.

Page 2

7. I have received training in the investigation of unlawful possession of firearms and possession of firearms by prohibited persons, as well as drug trafficking and related offenses. I have been trained regarding these offenses and has arrested individuals for federal firearms related offenses, as well as drug trafficking offenses. I have also investigated drug trafficking offenses at the state and federal level, including violations of Title 18, United States Code, Section 922(o) and Title 21, United States Code, Sections 841 and 846. I know from training and experience that those that commit crimes commonly communicate, photograph, videotape, and organize using electronic devices, including by phone call, text message, electronic mail, messaging application, and social media.

8. I have participated in numerous investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

9. I have participated in the execution of numerous search warrants in which weapons, narcotics, and/or evidence of drug trafficking were seized in violation of state and federal laws. I am familiar with the different types and calibers of firearms and ammunition commonly possessed for illegal purposes, as well as the methods used to conduct narcotics trafficking. I have had a variety of formal, informal, and on the job training in the investigation of illegal firearms

possession firearms trafficking, and drug trafficking. Additionally, I am familiar with street name(s) of firearms, controlled substances, and respective related topics, as well as has knowledge of the use of money laundering to conceal ill-gotten money.

10.  This affidavit is based upon my personal knowledge, and upon information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.  Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.  This affidavit is also based upon information gained from interviews with cooperating witnesses, and informants, whose reliability is established separately herein.

11.  The investigation to date has included traditional law enforcement methods, including, but not limited to: confidential informants, information from other law enforcement officers; recorded conversations; controlled buys; documentary evidence; physical surveillance; telephone records; electronic surveillance; and physical seizures.  However, because this affidavit is submitted for the limited purpose of securing authorization for search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are essential to establish the necessary foundation for the requested search warrant.

12.  Based on training, experience and participation in drug trafficking investigations and associated financial investigation involving controlled substances, I know and have observed the following:

a. I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States.

b. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances. I know it is common that those individuals engaged in drug trafficking often use more than one cellphone. This is done to attempt to insults a drug trafficker and to evade law enforcement detections.

c. I know that it is common for persons involved in the sales of controlled substances to be armed with guns and/or to keep firearms in their residence/apartment for their protection and the protection of their controlled substances.

d. It is a common practice for individuals engaged in high level drug trafficking activities to use multiple locations to conduct their drug trafficking activities. For example, a "stash house" is a location used to store controlled substances, firearms, and U.S. Currency.

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them.

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business.

g. I know it is common for persons involved in large-scale drug trafficking and related financial crimes to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as drug ledgers, currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. Because narcotics trafficking generates large sums of cash, it requires the keeping of detailed records as to the distribution of narcotics as well as the laundering of the proceeds. Such records also

Page 5

typically provide evidence as to the identity of additional criminal associates who are facilitating the laundering of the narcotics proceeds on behalf of the organization. These records, unlike controlled substances, are often maintained for long periods, even several years. These items are maintained by the traffickers within residences, stash houses, vehicles, or other locations over which they maintain dominion and control.

h.  I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have immediate access to them.

i.  It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time.  It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

j.  It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

k.  Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons.  However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

l.  I know large-scale drug traffickers often use electronic equipment such as telephones (landlines and cell phones), pagers, computers, telex

Case 2:24-mj-00500-SCD    Filed 09/28/24    Page 14 of 40    Document 1

machines, facsimile machines, currency counting machines and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities.

m.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering and structuring activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency.

n.  I know that the Currency Transaction Report (CTR) (FinCen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

o.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization(s).

p.  I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering and structuring activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

Page 7

q.  Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or related financial crimes; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks, manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data.

13.    Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

14.    This affidavit is intended to show merely that there is sufficient probable cause for the requested legal process and does not set forth all of my knowledge about this matter.

15.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of possession with intent to distribute controlled substances, conspiracy possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846, have been committed by Marquan C. OWENS, Makaylah BRACKINS and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

Page 8

## PROBABLE CAUSE

16. The United States government, including the HITDA, DEA, Waukesha County Sheriff's Department and the Waukesha County Metro Drug Unit, is conducting a drug trafficking investigation of Marquan C. OWENS, Makaylah BRACKINS and other identified and unidentified individuals for violations of illegal possession with intent to deliver controlled substances, and conspiracy to do the same, in violation of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843.

17. On December 6, 2023, an undercover agent (UC 1) was involved in a separate investigation was at a stop light in the City of Milwaukee. A vehicle identified as black 2024 Chevrolet Equinox, bearing Wisconsin Fleet plate 20523AFT (Equinox), which was determined to be a rental vehicle, pulled next to UC 1's vehicle. At that point the two occupants, both being black males, began conversing with UC 1 and exchanged numbers with UC 1. UC 1 stated the front seat passenger provided his name, "Rocky", and obtained two numbers from "Rocky" and the front seat passenger. Those numbers were identified as 414-885-9481and 414-627-4800.

18. Shortly after the contact, UC 1 received a call from the subjects and was instructed to "pull over for a free sample". UC 1 pulled over and exited their vehicle and approached the Equinox which had pulled directly in back of UC 1's vehicle. UC 1 obtained a "sample" of suspected fentanyl from the front seat passenger and returned to their vehicle and left the area. The sample was later weighed and tested, and a weight of 1.1 grams was obtained and the substance later tested positive for fentanyl. UC 1 was able to obtain video surveillance with still images of the vehicle and the two subjects inside (Figures 1, 2, and 3).

Page 9



(Figure 1)



(Figure 2)



(Figure 3)

19.    Based on the prior investigation, case agents are familiar that OWENS goes by the nickname "Rocky". After reviewing still shot images obtained by UC 1, case agents confirmed that the individual who provided the free sample to UC 1, identified himself as "Rocky", and provided telephone number 414-885-9481 is OWENS.

20.    On January 5, 2024, Marquan OWENS and another individual were arrested by the Milwaukee Police Department (MPD) after fleeing in a vehicle. Officers conducted a search of the vehicle and located suspected controlled substances. Inside the front passenger pocket officers

Page 10

located two clear plastic bags.  The first bag contained a Brown/Gray substance which tested positive for methamphetamine (NARK 11-01), cocaine (NARK 11-07), heroin (NARK 11-11) and fentanyl (NARK 11-33). This substance weighed 14.26 grams. The second bag contained a white chunky substance which tested positive for methamphetamine (NARK 11-01 and 11-15), cocaine (NARK 11-07), and fentanyl (NARK 11-33). This substance weighed approximately 18.0 grams. On the driver's floorboard officers located one clear plastic bag containing two clear plastic bags. The first bag contained a white chunky substance which tested positive for methamphetamine, cocaine and fentanyl and weighed approximately 1.80 grams. The second bag contained 13 individual baggies with a brown chunky substance which tested positive for methamphetamine, cocaine, heroin, and fentanyl and weighed approximately 8.30 grams.  On the front passenger floorboard was a double wrapped clear plastic bag containing a white chunky substance which tested positive for cocaine, fentanyl and methamphetamine and weighed approximately 3.52 grams. Officers also observed residual white powder throughout the front compartment of the vehicle, which was collected and tested positive for methamphetamine, cocaine and fentanyl and weighted collectively about 1.60 grams.

21. Officers also located one bag of white powdery substance discarded in the rear backyard of 4871 North 36th Street, Milwaukee, Wisconsin, which was directly in the flight path which OWENS and the other individual fled on foot.  The white powdery substance tested positive for fentanyl, cocaine and methamphetamine and weighed approximately 15.2 grams.

22. Also, during the search of the vehicle, officers located nine cellphones also.  Case agents later obtained a federal search warrant for all the phones and identified one of the phones as OWENS's telephone 414-885-9481.

23.     On January 11, 2024, OWENS was charged for this conduct in Milwaukee County Case 2024CF185.

24.     On January 13, 2024, OWENS's posted cash bail and was released from custody.

25.     On January 24, 2023, OWENS was charged by criminal complaint in the Eastern District of Wisconsin (EDWI) for violations of in relation to violation of Title 21, United States Code, Sections 841, 846 and 843(b), ( 24-M-303). An arrest warrant was issued for OWENS arrest on February 2, 2024.

26.     On February 7, 2024, case agents executed a federal search warrant on OWENS's residence XX50 South 60th Street, Apartment 2, Milwaukee, Wisconsin. OWENS was not present, but his roommate and co-conspirator, Kevin TENNER, was present. TENNER indicated to law enforcement that he did not know where OWENS was and TENNER last saw OWENS the

Page 12

evening before. The federal arrest warrant for OWENS remains active; however, OWENS was arrested on September 25, 2024 by Milwaukee Police Department.

27. On February 13, 2024, a grand jury in EDWI indicted OWENS for violations of Title 21, United States Code, Sections 841, 846 and 843(b) (24-cr-28). The indictment as to OWENS remains redacted due to his warrant status.

28. On February 15, 2024, OWENS was scheduled to appear in state court for Milwaukee County case 2024CF185. OWENS failed to appear for court and a bench warrant was issued for his arrest.

29. Case agents continued to monitor social media, including YouTube content of OWENS. Case agents observed OWENS was posting several music videos and interviews following the attempt to arrest OWENS on February 7, 2024.

30. Case agents specifically identified a YouTube channel labeled "Deadend Quan". Based on my knowledge of the case and individuals engaged OWENS's drug trafficking violations, I know this YouTube page features OWENS's rap videos, albums, and other music related material. Case agents have monitored this page and observed at least 9 music videos released since February 7, 2024, including one video labeled "U N—a's Though + Get Off Ig. The lyrics discuss "keeping" OWENS's name out "your mouth" and discuss reading things "in black and white" which case agents believe based on the timing of the release in April 2024, is in reference to Criminal Complaint 24-M-303, which was widely distributed throughout social media.

31. Case agents identified another YouTube channel labeled "Juice Talk TV". In February 2024, Juice Talk TV released a video, labeled "Deadend Quan addresses snitch allegations, says his name IS GOOD, on the Deadend block (THROWBACK)". During this video,

Page 13

OWENS was the subject of an interview where in the beginning of the interview OWENS stated, "I swear to god, I promise to god nigga I shot my first nigga where I shot my second nigga but the first nigga that told on me I shot right here". OWENS was being recorded walking in the middle of a residential street and pointing while making these comments. Case agents believe that based on the timing of the release and topic of discussion that OWENS was refencing his arrest in Milwaukee County in January, since case agents were aware that there was a significant amount of reaction on social media where OWENS was alleged to have "snitched" to get released from custody.

32.     Case agents noted additional videos that had been released on Juice Talk TV where OWENS was interviewed, including a series of at least five videos over a two-month time span beginning in July 2024. One of the videos is labeled "Deadend Quan Talks paperwork, Being Most Wanted & Releasing music, "IM SOLID & ALWAYS WAS" pt1". This video is an actual one on one interview with an individual case agents believe is the creator or individual running Juice Talk TV, Octavius SIMMONS, and was released on July 27, 2024. Case agents reviewed law enforcement databases and determined Octavius SIMMONS is the registered agent of Juice Talk LLC.

33.     During the interview, OWENS discussed that "you shouldn't believe everything you see on the internet" and when asked what he specifically was talking about, OWENS responded "narc shit, talking police shit" which case agents believe is referring to the rumors of OWENS being a "snitch" or informant. The interviewer, believed to be SIMMONS, then stated "you have been off the grid for a while and the music is still coming out". OWENS responded, "for sure". Later in the interview SIMMONS asked OWENS about being featured in a Fox 6 News special "Milwaukee's Most Wanted" which aired in April 2024. OWENS stated "that he

Page 14

had not seen it" but later acknowledged that he "heard about it" then made a reference to him not being an informant since the fact he is a fugitive was highlighted.

34. During the interview, OWENS was seated in front of a table and had two cellphones in front of him, which both appeared to be iPhones. Case agents eventually identified a possible telephone of OWENS as 414-861-4774.

35. Honorable Judge Nancy Joseph authorized the electronic surveillance of OWENS's telephone number 414-861-4774. Case agents learned that one of the top callers for the OWENS's telephone number 414-861-4474, was a female identified as Makaylah BRACKINS. Case agents learned that on July 2, 2023, BRACKINS had been operating a vehicle bearing the registration AJC-9755, which listed to a Phylicia Martin with an address of XX50 West Leon Terrace, Milwaukee, Wisconsin. BRACKINS was subsequently stopped for a traffic violation and was issued a traffic citation by the Milwaukee County Sheriff's Office on that date.

36. Case agents learned that the court authorized electronic surveillance for OWENS's telephone number 414-861-4774 was consistently showing that the telephone was inside a radius where the XX50 West Leon Terrace, Milwaukee, Wisconsin was also inside of that same radius. Case agents then checked historical information and while reviewing previous cellphone downloads obtained from OWENS's January 5, 2024 arrest, case agents observed that there calls and text messages from OWENS's previous number identified by case agents, 414-885-9481 to telephone number 414-526-2204. Case agents checked law enforcement databases and learned telephone number 414-526-2204 was registered to BRACKINS and had a registered address of

Case 2:24-mj-00500-SCD    Filed 09/28/24    Page 23 of 40    Document 1

XX50 West Leon Terrace, Milwaukee, Wisconsin, the account active through AT&T cellular service provider.

37. On the morning of September 26, 2024, case agents were made aware that OWENS had been taken into custody on the evening of September 25, 2024 by the Milwaukee Police Department. Case agents learned that the Milwaukee Police Department had received an anonymous tip indicating that OWENS was operating a Toyota Tundra bearing Wisconsin registration ATK-2330. Officers were aware that OWENS had multiple outstanding warrants for his arrest and was also wanted by the United State Marshals Service. The tipster also provided information that OWENS and two passengers were in possession of a large number of illegal narcotics and firearms.

38. Officers learned that the ATK-2330 registration listed to a 2008 Buick Enclave indicating that the registration plates on the vehicle did not belong on the Tundra. Officers located the Toyota Tundra, bearing Wisconsin registration ATK-2330, traveling southbound on I-794 at 8:22 pm. Officers did attempt a traffic stop on the Tundra. Upon Officers activating their emergency lights and siren in an attempt to conduct a traffic stop on the Tundra, the Tundra did not stop and begin to accelerate at a high rate of speed in a very quick manner.

39. The Tundra began weaving in between other motorist began now traveling eastbound on Layton Avenue. At that point a pursuit was initiated and during the pursuit, which lasted 10.26 miles, there was an approximate top speed of the Tundra estimated to be 111 mph. Officers successfully deployed a tire deflation device, and the Tundra came to a stop after striking a pole in front of the address at XX12 North 26th Street, Milwaukee, Wisconsin. Once the vehicle came to a stop, officers observed the front driver side door and the front passenger door open and noted two individuals exit the vehicle, with one individual exiting on each side. Officers identified.

Page 16

Case 2:24-mj-00500-SCD    Filed 09/28/24    Page 24 of 40    Document 1

OWENS was identified as the individual who exited the front driver side of the vehicle, which is consistent with the information that OWENS was operating the vehicle which was provided by the anonymous source. After a short foot pursuit, OWENS was arrested and later transported to central booking for processing through the City of Milwaukee Police Department.

40. Officers later learned that the Toyota Tundra had been reported stolen (Milwaukee Police Department case number C24–0916–0148). The front seat passenger identified as Christopher Williams was later taken into custody after a short foot pursuit, and transported to the City of Milwaukee to Police Department Central booking. The rear seat occupant, identified as Frederick Evans, did not flee from the vehicle and was cooperative upon initial contact with Officers. Evans was subsequently released from the scene. OWENS and Williams were referred to the Milwaukee County District Attorney's Office for charges related to the incident and that case is currently under review.

41. During a search of the vehicle officers located a clear plastic sandwich bag located in the front passenger door as well as a credit card and Wisconsin ID for the front passenger who is later identified as Christopher Williams. Officers located six cell phones along with a silver and black digital scale, which is located in the front passenger side area. The phones were described as the following.

   a. a gray TLC flip phone, Track phone, with no known serial number, located on the drivers side floorboard;
   b. a gray Vortex, smart phone with clear rubber case with no known serial number, located on the ground outside of the driver's door;
   c. a black Maxwest smart phone with no known serial number, located on the rear passenger seat in a tan bag;
   d. a gray consumer cellular smartphone with no known serial number, located on rear passenger seat inside of a tan bag;
   e. a white iPhone, unknown model, and no known serial number, with what was described as a "shattered back", and a black phone case located on the front passenger seat; and

f. a white iPhone, unknown model and no known serial number, with what was described as a "cracked front screen" inside of a black case, located on the front passenger floorboard.

42. Officers located 11.1 g of suspected THC, which was located outside of the driver side portion of the vehicle along with five yellow and orange pills which later field tested positive for methamphetamine and fentanyl along with a sandwich bag which contained a powder like substance, which was purple and color and later field tested positive for fentanyl. The total weight of the pills was 1.5 g and the total weight of the purple powder was .05 grams.

43. Officers did note that prior to searching the vehicle, they observed the front passenger window to be cracked "a few inches "with a white and grey powder covering the side of the window and the rear passenger side window. Officers believe the substance was fentanyl due to the empty plastic bag, which was located in the rear passenger seat. Officers also noted the digital scale and cell phones were all covered in the same residue. This information let officers to believe that somebody had discarded narcotics throughout the lengthy vehicle pursuit.

44. Case agents did attempt to conduct a recorded interview with OWENS, but OWENS did not wish to speak with case agents at the time and no interview was completed.

45. On the afternoon of September 27, 2024, case agents learned that OWENS had made a recorded jail call from the City of Milwaukee Police Department to an individual identified as Makaylah BRACKINS. The call was placed at 9:30 am from OWENS to telephone number **414-861-3177 (Target Cell Phone).** Case agents determined **414-861-3177 (Target Cell Phone)** belonged to BRACKINS based on the content of the calls. OWENS asked who she's with, and BRACKINS says "nobody". OWENS states "I think what's his name set me up". BRACKINS then tells OWENS there is a video of "the police chasing" OWENS.

Page 18

46. When asked about the video, BRACKINS states, "Kiki said her and cheese got into it" and at some point the video was referenced. OWENS says he released his property to her and that she has to come get. OWENS then spells BRACKINS's first name (Makayla) and asks if he spelled it right. BRACKINS corrects him on the spelling (Makaylah) saying there is an H at the end. OWENS then confirms her birthday stating, "your birthday is Nov 17, 1998" and BRACKINS corrects him saying "Nov 18". Case agents confirmed that the spelling of BRACKINS name matched what case agents knew her name to be along with the date of birth which was confirmed to be November 18, 1998. This leads case agents to believe that the person OWENS was in contact with is in fact BRACKINS, using **414-861-3177 (Target Cell Phone)**.

47. OWENS tells BRACKINS he that "really misses her" and asks "did you see my cousin? He states, "my cousin Fred" and BRACKINS says "I don't know, was that who you was in the car with". OWENS responds "yeah, you know we on this phone". Case agents believe that OWENS is referencing to the fact the call is being recorded.

48. BRACKINS then talks about the incident being on the news. OWENS says "Look, my drugs should be, you got to get, my uh cash app is on one of those phones bro, so you got to go get another phone or can you get into cash app". BRACKINS says she can get in there and OWENS replies "get in there, there's 2 g's in there" and "come get this money it's like 1700 on my books". OWENS says "get that cash app" and "put that money" and then he says "remember them shoes, ain't anybody call you".

49. OWENS then asks if someone called BRACKINS but the name was inaudible. BRACKINS began to reply but OWENS cuts her off saying "she talk to who" and BRACKINS replies "you're people?" OWENS states "listen you know, remember I was telling you with them shoes we was waiting on before you got me, what's his name to put with it". BRACKINS replies "yeah". OWENS states "that's why you got to go get that phone so I can give you". BRACKINS tries to talk but OWENS tells BRACKINS to "listen" and "Get my other phone, the other one and get it on". OWENS appears to stutter and starts and stops before finally stating "so you can get what's his names number" and "Those shoes should be coming on Monday for sure and you know what I mean". You have to be, you know what I mean, on the G". Based on my training and experience, I know those engaged in drug trafficking will often use code words when discussing controlled substances, in an attempt to evade law enforcement.

50. Case agents later learned that there was an additional call made from OWENS to BRACKINS at telephone number **414-861-3177 (Target Cell Phone)**. Case agents have yet to review this call but learned from Officers from the City of Milwaukee Police Department, which I have known to be reliable in the past, that based on the conversation between OWENS and BRACKINS on telephone **414-861-3177 (Target Cell Phone)**, it is believed that the "shoes" that are being discussed are being sent to an undisclosed location. Officer also indicated that in this additional on BRACKINS telephone number **414-861-3177 (Target Cell Phone)**, OWENS is attempting to provide BRACKINS information for a "Spanish" guy, but OWENS refuses to say the name over the recorded jail call.

Page 20

51. OWENS does tell BRACKINS that the number for this person along with his name is in OWENS's phone. Officers informed case agents that they believe OWENS is continuing to use coded information in an attempt to provide BRACKINS with the information over to jail call. It is believed OWENS and BRACKINS are using this code information to prevent officers or case agents from learning of this information. This would be consistent with OWENS and BRACKINS being engaged in criminal conduct. Based on the conversation summarized by Milwaukee Police Officers, case agents believe that OWENS is instructing BRACKINS to meet with this individual to pick up the "Shoes" (suspected controlled substances) that are being shipped. Case agents further believed that based on the information from the record jail calls, OWENS is using either an unknown delivery process to have illegal narcotics shipped. Case agents will be conducting a full review of the jail calls once they are received at a later time.

52. Based on my training and experience, I know that "shoes" is a slang term used by drug traffickers for large quantities of illegal narcotics, and commonly is used to reference heroin/fentanyl. Case agents are also aware that OWENS was arrested with $1,700.00 is US Currency on September 25, 2024, which is consistent with him telling BRACKINS to retrieve the currency from his property. Case agents know that individuals will use coded messages and talk when trying to evade recordings, like calls commonly made in corrections settings. Case agents believe based on the information that OWENS is receiving a package containing suspected illegal narcotics and is directing BRACKINS to retrieve this package. Case agents believe that BRACKINS is aware of the package contents and appears to be a willing participant in assisting OWENS.

53. BRACKINS is believed to be in possession of and utilizing a communications device, specifically a cellular telephone assigned the number **414-861-3177 (Target Cell Phone)**.

Page 21

54. The physical location of this cellular telephone is unknown.

55. Case agents queried telephone number **414-861-3177** via a law enforcement database, which identified the mobile carrier as AT&T and registered to BRACKINS.

**TECHNICAL BACKGROUND**

56. I believe cellular telephones assigned call numbers **414-861-3177** (the "Target Cell Phone"), whose service provider is AT&T ("Service Provider"), a wireless telephone service provider, continues to contain valuable information on this account that could be used as evidence for the possible crimes of possess with the intent to distribute controlled substances, conspiracy to do the same, and use of a communication device in furtherance of drug trafficking, all in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846.

**JURISDICTION**

57. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**TECHNICAL BACKGROUND**

58. Based on my training and experience, I know that Service Provider can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phone**, including by initiating a signal to determine the location of the **Target Cell Phone** on Service Provider's network or with such other reference points as may be reasonably available.

**A. Cell-Site Data**

Page 22

59. In my training and experience, I have learned that Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

60. Based on my training and experience, I know that Service Provider can collect cell-site data on a historical and prospective basis about the **Target Cell Phone**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business to use this information for various business-related purposes.

**B. E-911 Phase II / GPS Location Data**

Page 23

61.     I know that some providers of cellular telephone service, including Service Provider, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

62.     As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

63.     I also know that certain wireless providers, such as Service Provider, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time, or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

64.     Based on my training and experience, I know that Service Provider also can collect per-call measurement data, which Service Provider also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based

Page 24

upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

65. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

**C. Pen-Trap Data**

66. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**D. Subscriber Information**

67. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber,

such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business.

68. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone's** user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between Makaylah BRACKINS, and other identified and unidentified subjects is material, in that it can establish whether the calls described above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether Makaylah BRACKINS, and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## V. AUTHORIZATION REQUEST

69. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

70. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

Page 26

71.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the locations of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

72.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

Case 2:24-mj-00500-SCD     Filed 09/28/24     Page 35 of 40     Document 1

## ATTACHMENT A

### Property to Be Searched
### Matter No. 2023R201

1.      Records and information associated with the cellular device assigned call number **414-861-3177** (referred to herein and in Attachment B as the "Target Cell Phone"), that is in the custody or control of AT&T referred to herein and in Attachment B as the "Service Provider") a wireless telephone service provider headquartered at 11760 us Hwy 1 N. Palm Beach, FL 33408.

2.      The Target Cell Phone.

**Particular Things to be Seized**
**Matter No. 2023R201**

I.     **Information to be Disclosed by the Service Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.  The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone for the time period from September 1, 2024, to present:

   i.  Names (including subscriber names, usernames, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long-distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.  Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number

Page 29

("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix.   All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as per-call measurement data (also known as "real-time tool" or "RTT").

b.   Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

Page 30

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e., faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as per-call measurement data (also known as "real-time tool" or "RTT").

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone.

c. Information about the location of the Target Cell Phone for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the

Page 31

Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

II.     This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

### III.     Information to be Seized by the Government

73.     All information described above in Section I that constitutes evidence and instrumentalities of possible crimes of possession with intent to distribute controlled substances, conspiracy to possess with the intent to distribute controlled substances, violations of Title 21, United States Code, Sections 841 and 846; and use of a communication device in furtherance of drug trafficking, in violation of Title 21, United States Code, Section 843, committed by Marquan C. OWENS, Makaylah BRACKINS, and other identified and unidentified subjects during the period of September 1, 2024, to present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.